Good afternoon, ladies and gentlemen. We're ready to hear argument now in Weisheit v. Neal. Mr. Perkovich. Joseph Perkovich for Jeffrey Weisheit. Good afternoon. The gravely afflicted trial counsel would be a good place to start in this very difficult case with a very burdensome record before the court presently. The initial first chair suffered from esophageal cancer, was undergoing treatment for it before dying, before trial. Mr. Dodd was replaced by Mr. McDaniel, who himself in the penalty phase had a medical emergency that rendered him unconscious and completely incapacitated, leaving at a very critical juncture argument to proffer a basis for expert testimony, very critical expert testimony to a second chair counsel with no capital experience, who failed in making that proffer and thereby led to the exclusion of a vital witness. These errors and others stacked up and were deemed by two justices of the Indiana Supreme Court as deficient performance and by the chief justice of that court as ineffective assistance, as reflected in her dissenting opinion, which relied on just three factors concerning the deficient performance of counsel. What has emerged in the federal proceedings is that the job was far worse than that at the trial level. What is more, the post-conviction counsel failed to elicit the evidence of that deficient performance. And as a result, the extensive pleadings in the district court reflected a number of unexhausted claims that relied on extensive development by virtue of the entitlement to counsel and critically resources for federal counsel under 3599F. In the end, after a very, very difficult period for everyone and certainly the litigation due to the global pandemic and lockdowns and interruptions to understate it, the case was swiftly exited from court prematurely. This was the case, despite the pendency for an extensive period of time, of a motion to return to state court following the tectonic shift in the Martinez-Trevino jurisprudence that the decision in Shin v. Ramirez in the Supreme Court in 2022 effectuated. And that is where we find ourselves today, to boil it down. The vital evidence that exceeded what was put forward and relied upon by the Indiana Supreme Court in its conclusion in relation to the cumulative error under Williams and Wiggins in that line of cases was really the tip of the iceberg. And what was being developed for presentation under the auspices of Martinez and Trevino in the federal court was far much more. However, it became apparent after Shin, of course, that evidentiary presentations in the district court were no longer the law, which, of course, also upset this court's decision in Brown v. Brown, which preceded Mr. Weisheit's litigation in the district court by two years. So with this massive change in the jurisprudence and the need to present this evidence, we sought to return to state court and establish good cause for the raft of claims that are implicated by that and swiftly sought that return within a couple of months of the Shin decision. However, the district court, in denying ultimately that motion, found that we were lacking good cause and Weisheit had been delaying. I'd like to address delay first, perhaps. Before you do, can I just clarify a couple of things, please? I think you have agreed that in order to proceed on the claims that the district court found were procedurally defaulted, that you need to develop evidence to put in the record to proceed on those, correct? Yes, Your Honor. So the claims that the district court found are procedurally defaulted. You concede you cannot succeed on those claims without more evidence. Yes, and it is complicated by the fact that there are quite a lot of ineffectiveness claims. Yes, so I want to ask just a few more follow-up questions, please. And I think you have also agreed that after Shin, the only way to get an evidentiary hearing in federal court is if you meet the requirements of 2254E2. Correct. So post-Shin, you're not arguing that you can still try to meet good cause separate and apart from the requirements of 2254E2 in federal court. Is that correct? Yes, Your Honor. What we recognize after Shin is that for the new evidence concerning these ineffectiveness claims to be heard anywhere, and for that record to be developed, in this case, right? In this case. I'm asking about this case, right? Just this case. Absolutely. So you recognize you cannot do that in federal court post-Shin. And we need to turn to state court to do that. And I think you've also conceded that you cannot meet the requirements of 2254E2, correct? Yes. For federal court. So what state court process is still available to you after Isom? And let me split it up if I could, please. What state court process is still available to you for your procedurally defaulted claims that are not tied to ineffective assistance of counsel, which there are a handful of those? And what is available to you for those that are tied to ineffective assistance? I'll take the latter point first, or question. What's clear in the Section 12 of Rule 1 jurisprudence in Indiana is that that court has had very limited dealings with it based on the jurisprudence. We're really talking about a handful of cases. But going back to the 1989 decision for Baum, where in the earliest decision with that new section that was amended to the rule around that time, the standard for procedurally fair setting was set. In other words, we're not- We're talking about for successive- For successive- Petition. Right. And so first, of course, the sort of basic gateway is a showing of a reasonable possibility that the petitioner is entitled to relief. So what does that translate to? Baum articulated that the statutory entitlement to post-conviction counsel boils down to whether the petitioner had a procedurally fair setting. It's a very low floor compared to Strickland, even. However, it's not impossible. Fast forward 16 years after Baum, you have the Graves decision. And in Graves, it's noteworthy for a few reasons here. First, permission was granted from the appellate court to go to the trial court to entertain the successor petition. So it's not that the door is always locked, clearly, in the half dozen cases we're dealing with. Second, while the trial court denied the petition, the intermediate appellate court reversed it. And it found that, indeed, the procedurally fair setting was lacking in the Graves case. Now, that was ultimately reversed by the state Supreme Court. But I mention this here because this seemingly very low floor of procedurally fair setting is deceptive in this vein. And I think it's also worth noting in Graves, there's a reliance on Hendricks, or an allusion to Hendricks, which is a 1990 decision of that court. And there, Justice DeBruyler, at great length, explains basically the tripping point of Baum, if I may. And the tripping point of Baum is that the post-conviction issue that was put forward there in terms of deficient performance in 1989 was submitted as a ground for relief, as opposed to an equitable reason why the successor should be considered. What Justice DeBruyler in Hendricks says is, if you've got deficient post-conviction counsel, and Hendricks was a third petition, so double successor, if you've got deficient performance from post-conviction counsel, that can be an equitable reason to overcome the state's arguments answering the motion for leave. So in other words, state raising prior adjudication, abusive process, res judicata, it's explicitly recognized in Graves. How do you deal with ISM? ISM, indeed, is the first decision of that court since 2005, of course. And ISM clearly found no successive petition where the claims were either barred by res judicata, that the state court had already litigated them, or they were procedurally defaulted, which is what we have here. So how do you get around that? So procedurally defaulted, as a matter of federal law, is different from the inquiry that the Indiana court-  Right. And so that's where the rubber hits the road. In other words, the onus is on us to make the showing along the lines of what I'm outlining was articulated in Hendricks, was relied on to an extent in Graves, which is that that lacking of a procedurally fair setting is not insurmountable. Again, Graves recognized in granting leave for that petition to go to the trial court, for that process to unfold, and for the intermediate appellate court in the first instance to make such a finding that it's not an abstract idea, it's not a unicorn, it can happen. And we're dealing with a sample set that's tiny here. In the scheme of things, we've got six cases over 36 years. And so ISM, of course, is the first to address this in quite a long time, is not the final word, and- And I guess another way to ask the question is, looking at ISM, the unpreserved claims or the procedurally defaulted claims, can they be considered in Indiana in a successive post-conviction petition after ISM? Yes, and I think what's critical there is the showing that will be made with regard to deficient performance of the initial post-conviction counsel. Because again, that is what's relied on in Graves, what is highlighted in the Hendricks concurrence, and that will articulate in the end the procedurally fair setting analysis. Again, I underscore that there's just such a small sample set here, it doesn't really amount to a jurisprudence per se. We only have a couple of cases. What we know are these markers there. And what is clear, because Graves endorsed this and no subsequent decision has addressed it or tried to compromise this basic viewpoint, which is what was set forth in Hendricks. An equitable reason for prior successors, and we're talking about multiple successors in Hendricks, not being an ultimate stumbling block is the showing about the inadequacy of the prior post-conviction counsel. And so I think that that's going to be a case-by-case analysis. And what occurred in ISM, of course, is wholly different from our record. And also to take a step back, we're talking about questions of federalism and comity here, and it certainly militates against having the district court prejudge what a state court would do, especially in a procedural context such as this one, which is quite unusual. So is your argument that just the availability of a procedure to bring a successive petition is all you need, that we shouldn't assess the likelihood of success of that procedure? No, I don't go that far. Assessing the likelihood of success, though, has to occur in this context. And, again, half a dozen cases is a very limited context compared to pretty much any other jurisdiction we want to look at. And more pressing, the fact that the rules of the road had been changed very dramatically mid-ride, if I can continue the metaphor for Mr. Weisheit. We're in federal court under Martinez-Trevino. We're proceeding very clear from the beginning. But that's just the ineffective assistance of counsel claims. Yes, Your Honor. But, candidly, those are the bulk of our claims, and those are decisive, which, if I may, would allow me to shift some attention to the 3599E. Before you do that, please, if you could answer, I know I gave you a multi-part question, but if you could answer the second part that Judge Pryor just alluded to. What available state remedy do you have for your non-ineffective assistance of counsel claims that the court found were procedurally defaulted? This may strike the court as a paradox here. I will say it anyway. So with Martinez-Trevino, it's clear that the equitable rule created from the open question in Coleman v. Thompson, of course, that the failure of that initial counsel in post-conviction federally can overcome trial counsel ineffectiveness only, because that's the first time. But those are all ineffective claims. So in the Indiana scheme, there isn't that restraint, because, again, we're talking about the procedurally fair-setting question. And what's articulated with regard to Graves, with regard to Hendricks, is that a failure of post-conviction counsel can be an equitable reason to counter the state's arguments in its affirmative defenses about race, juvenile, and the rest of it. So this is uncharted territory because of the small sample size, but it's more open than the federal jurisprudence in that way. So claims 1 and 2, they deal with the competency to stand trial, procedurally defaulted claim. And so is it the contention that there is no argument? I guess I'm trying to get an answer to Judge Haney's question. So if I follow you, no. Our position is that the deficient performance of post-conviction counsel and failing to present that adequately at post-conviction and exhausted is the affirmative defense the state puts forward in answering the motion for leave to have the successor heard. And so it's wider because, bluntly, the jurisprudence is underdeveloped. Has any Indiana court ever held that? No. To put it in context, the Baum opinion, probably looked at it, it's two pages, six paragraphs. This is uncharted territory compared to pretty much every other jurisdiction. So we would have to be expanding Indiana law. No. Your Honor, all you would be doing is recognizing that in the first place, the state court should make this decision with regard to this pivotal juncture in the comedy dynamic in habeas. But, again, that might work for your ineffective assistance of counsel claims, but these non-ineffective assistance of counsel claims, I don't know how you could possibly get those back before the Indiana courts. I would submit that the failure in the process that necessitates a subsequent process is post-conviction counsel, the state post-conviction counsel. So, again, that's a wider remit in terms of the performance problem than the narrower one federally. I understand your argument. I just don't see any law that would support that in Indiana. I would point you to Graves and Hendricks again. And these are not the most robust libraries of decisions, of course. We're just talking about a handful of decisions, but this is what we have. Justice Dubrouillard's concurring opinion in Hendricks I think is very helpful in this vein. It's an underdeveloped area of the law. The fundamental point, though, is that this should be left to the state court to determine this question because of this underdevelopment of the law. And it was, well, an abuse of discretion by the district court, especially with regard to the particular rationale for delay and good cause, the finding that there was not good cause. There was doubly good cause across the board in the ineffective assistance of trial claims. And I do want to focus on those because those are the lion's share of the issues here. And also, when we in a moment turn to the 3599 problem in this case, they're most essential. Should the certificate be expanded to encompass these claims that don't involve ineffective assistance of counsel? We invited to go back and ask the district court to expand the certificate, and so just wanted to. With respect to the 3599 issue and the Ryan's issue, those are before the court and do not need a certificate of appealability based on precedent. I point foremost to Aiestes in the Supreme Court, which there was no COA when that case was taken and decided. And I'll pivot to that issue right now because, again, it's essential. On the eve of the First Amendment and the last amended petition, it became known to counsel that the expert who was approved at the outset of the case in 2020 did not have the imaging to do what he was authorized to do. He was authorized 27 and a half hours for quantitative analysis of the brain imaging in February of 2020. During the COVID pandemic, his entire clinic was dismantled. All the consulting he was doing on cases was thrown aside. All resources were put into the hospital's work, so he had to rebuild that. When he did, he learned on July 30 of 2022 that the imaging was inadequate to do the quantitative analysis that was authorized and determined reasonably necessary years prior. Two days later, he filed an ex parte motion and indicated that we need less than $3,500 in the transport order for the imaging to occur. That was denied. What would that information be used in? What subsequent proceeding hearing would that information have been used for? So we sought this before Shin came down. However, under 3599 E and F, it's clear that first the appointment of counsel contemplates subsequent judicial proceedings and more. And the more is important here, too, because it entails executive clemency. So where that evidence would be put on is really, I don't want to say immaterial, but it's not limited by the terms of 3599 F. And in fact, they're- But why not? Because the court has to make a determination that the services would be reasonably necessary for representation. So you have to have a place where it's necessary in order to make that determination. Your Honor, absolutely. It was absolutely necessary in federal court before Shin ruled out 2254 E2 presentation. That's off the table now, though, given Shin. Right. And subsequent proceedings under 3599 E, which are contemplated by the appointment and occur every day under CJA appointments, entail return to state court where that evidence could be put on. I'll give an example because it's very, very- And I guess that's somewhat circular because we've asked where in state court would it be used or how. And so is it the contention that it's the successive proceeding if Indiana would permit it? Yes, Your Honor. Here's an analogous case, Trevino v. Thaler. Before it was Trevino v. Thaler, nine years before, when that case entered federal court, the CJA attorneys understood that they did not have mitigation evidence. And that claim needed to be made. They sought a stay before Rines even, got a stay, returned to state court, and sought to exhaust that claim. Now, ultimately, under adequate and independent state grounds, it was deemed that they could not do that in state court. However, the record that they made with the evidence around mitigation, attempting to make that record in state court, ultimately, years forward, was entertained in the federal court, in the district court, and then the Fifth Circuit after Trevino v. Thaler. So that evidence was developed pursuant to a CJA appointment, pursuant to the specialist resources under 3599, ultimately came forward and was in the federal record because it was exhausted in state court. So it can be circuitous. This is how this goes sometimes, unfortunately, because this is a very Byzantine exercise, to put it mildly. If I may, a word about exhaustion, because the district court focused very, very heavily on the notion that these are procedurally defaulted, they're categorically so. It's clear that the doctrines of exhaustion and procedural default are, you can argue they're one doctrine. They're certainly two sides of the same coin. And it's worth noting that Martinez itself never mentions the word exhaustion. It mentions procedural default about 70 times in the opinions. You move forward into Trevino. I think it's worth noting that Chief Justice Roberts, in his dissent in Trevino, begins by quoting Coleman. Coleman v. Thompson provides that a state prisoner who fails to exhaust state remedies or has failed to meet the state's procedural requirements for presenting his federal claims will not be entitled to federal habeas relief unless he can show cause. So the notion there from the beginning is there's procedural default in terms of rules. Coleman appealing from the denial of the petition in state court, they failed to meet the 42-day filing date for the appeal, that's how Coleman lost. It was a procedural default in a pretty classical way. That's distinguished from exhaustion. Fast forward to Shin. In Shin, Justice Thomas provides, when a claim is unexhausted, not procedural default, when a claim is unexhausted, the prisoner might have an opportunity to return to state court to adjudicate the claim. So the semantic fixation on procedural default here really does a disservice to the basic federalism and comity inquiry that was before the district court. And it's clear that good cause was established for the Rhine State both before Shin came down in terms of the failures of post-conviction counsel. Mere negligence in the Northern District of Indiana in the Supernat case, for instance, was found to be ample good cause. It's a very low bar. And the Ninth Circuit, for example, has found repeatedly that Martinez's cause in terms of deficient performance of post-conviction counsel amply satisfies the Rhine's good cause standard. So good cause was had before. There's one more that we need to, before you get into your rebuttal time, I wanted to ask about the competency. I know that was one of the claims that were raised that the judge abused her discretion in not granting the request to stay until the petitioner became competent. Yes, Your Honor. Again, in the middle of the pandemic, the ability to develop the evidence to amend our pleadings was beyond compromised. Obviously, this was a once-in-a-living-memory event, and the timing for Mr. Weissheim was extraordinarily bad. So the impact in terms of his lack of competency, and this entailed him being removed from the prison repeatedly, hospitalized. We were unable to access him or his whereabouts repeatedly, so let alone provide experts to evaluate him. It was a very challenged exercise in terms of the amendment of pleadings and extending that. What this really highlights is the vital importance, and this is a self-evident assertion of Mr. Weissheim's brain. That's why the quantitative analysis of Dr. Gurr was central to the case. That's why when we look at the dissent from the state Supreme Court finding cumulative error, that's even without any evidence of Mr. Weissheim's brain. And so that's the frustration and the shutdown in the process here that the effort with 3599 was there to correct. Again, in February of 2020, the district judge granted the funding for the analysis of the imaging. Not until the eve of the First Amendment petition did the expert realize his office did not have adequate imaging. And then retroactively, it was deemed not reasonably necessary any longer. And again, this is also not an inquiry from the court's determination. Rather, it's whether counsel deemed it reasonably necessary in counsel's reasonable performance. So it's a very representation. Counsel, if you want to save any time for rebuttal, now is the time. I had declared that I was saving six minutes initially, but I will save my balance for that.  Certainly. Mr. Banks. May it please the court, Tyler Banks for the respondent warrant. Weissheim has not and cannot meet his burden to obtain relief from his convictions and sentence. The Indiana Supreme Court reasonably rejected all of his claims by faithfully applying clearly established federal constitutional law on both direct appeal and post-conviction review. Weissheim's convictions and sentence were the result of a constitutionally fair trial where he was given more than effective representation in front of an impartial jury. Now in federal court, he is not entitled to any further evidentiary development, and any return to state court will be futile because he has fully exhausted his state court remedies. Like every court before this one has done, this court should deny him relief and affirm. The district court did not abuse its discretion in failing to grant a stay under Reins. It based its decision on two independently valid grounds. One, because he has no viable available state court remedies, and two, he engaged in dilatory litigation tactics. As to the first, the only available possibility of future litigation in state court is a request for permission to file successive petition for post-conviction relief. But the Indiana Supreme Court has unequivocally as recently as this summer said that it will not grant permission for successive petition when that petition contains claims that could have been presented previously and were not or were previously decided adversely to the prisoner. Now there is a caveat here. I'm presuming that the claims that Weisheit has identified first as procedurally defaulted then exhausted are the ones he would raise in state courts. He's identified no other ones, and he's conceded today that he can't meet Section 2254's requirement of having new evidence or a new claim based on a factual predicate that couldn't have been developed with the exercise of due diligence. But if these are the claims that he intends to bring to the state court, then he is no different than Kevin Isom. And the Indiana Supreme Court unequivocally said that it would not grant a petition. And they have said that since 2005 regardless of the— Is that something, though, that should be left up to the Indiana Supreme Court to decide? Because Isom didn't answer the question as to whether or not we should be deciding that versus the Indiana Supreme Court. A couple of responses to that, Your Honor. First, this court and federal courts do decide these questions of state law and the availability of state court remedies. It does it in this context. It also does it in the context of procedural default on independent and adequate state law grounds. So to determine whether a state's waiver rule or Indiana's waiver rules are regularly followed such that it would bar federal review, that's an analysis of state law. And district courts in Indiana and this court have done that repeatedly and regularly. Second, flatly, we know what the Indiana Supreme Court will say because it said it. It said it this summer. It said it in 2005, and it said it other times. And not only did it say it this summer, it also said that it was not interested in reforming its procedural default rules and successive petitions, even in light of Martinez, Introvino, and Shin. And that is precisely what Weisheit wanted to return to state court to do. Some of the case law seems to suggest that on the question of whether or not there is a state court pathway, that the ultimate question is only whether or not something is available, not whether you would be successful in that availability. How do you respond to that, and what's the best case law going against that? Let me. I don't have a specific case to cite against that, Your Honor, but let's just look at the logic of it. Indiana Post-Conviction Rule 112, which allows for this process for successive petitions, if it were the case that availability means someone could just file any request at any time, then it would always be and endlessly be available. There is no limit in Indiana on the ability to file requests for successive post-conviction relief because that mechanism is principally intended to deal with issues that are basically new evidence, newly discovered evidence or evidence that could be Brady material. That's most of the function of that rule. It is not to re-litigate or to newly litigate claims that could have been raised in initial collateral review proceedings. I want to address the idea that Wise Height's collateral review counsel was ineffective. At no point in his brief and at no point today has he explained exactly how post-conviction counsel did not perform to the bar of Strickland. But what this court has said and what the U.S. Supreme Court has said is that when it comes to evaluating counsel's performance, it is to look at the whole record and to determine whether competent representation was made. And here in state court it was. He was represented by the Indiana State Public Defender's Office, which specializes exclusively in post-conviction litigation. He was appointed three seasoned attorneys and had at least one investigator working for him. Those attorneys filed a petition with about a dozen claims. They conducted depositions, hired experts, including Dr. Gore, called lay witnesses, examined experts who had evaluated Wise Height, moved to exclude the state's expert, and conducted a three-day evidentiary hearing on the petition. After the hearing, they drafted a 50-page proposed order arguing for relief. And after relief was denied, they represented Wise Height on appeal to the Indiana Supreme Court. Given this course of extensive and skilled representation, he's not going to be able to make the Strickland burden to get relief under Martinez to the extent that there's any evidentiary development to be made. And it has been conceded today that there is no further evidentiary development to be made in federal court. The only route to that is through state post-conviction litigation. And Wise Height, again, provided the claims that are in his petitions are the ones that he wants to raise, is not available to him. And simply the only allegation that post-conviction counsel should have done something different or better was that they should have had Dr. Gore do this quantitative analysis that he wants to do. But this complaint is unfounded by the record. At the post-conviction hearing when Dr. Gore testified, he was asked if he conducted this quantitative analysis. And he responded, I didn't know to. That is not the testimony of an expert who believes that he can prove his theory of brain trauma above and beyond that which can merely be seen on an MRI image. If Dr. Gore as the expert believed that his quantitative analysis was necessary to help Wise Height prove his traumatic brain injury theory, it was on him as the expert to inform counsel. Counsel is only required to conduct a reasonable investigation, which they did, by hiring Dr. Gore and looking into Wise Height's mitigation theory of mental health and traumatic brain injury. At that point, the person with expertise is the one who tells counsel what is needed as part of their consultation and to come to a scientifically reliable conclusion. Of course, Dr. Gore told the district court why he didn't do this analysis. He testified in state court that the result of any quantitative analysis to attempt to determine the timing of alleged traumatic brain injuries that Wise Height suffered would be, he used the word, speculative. Then the state court relied on that assertion to discount the usefulness of his testimony. And then in the district court, there was an affidavit filed by Dr. Gore, and he said that when he used the term speculative, he meant that he could not guarantee before doing the analysis that any conclusion would be favorable to Mr. Wise Height. That is an admission that Dr. Gore was not following the scientific method to come to a verifiable and reliable conclusion. He was working as a person seeking favorable results for the party who was paying him, which not only proves that any results he would provide would be unreliable, but also proves that counsel would not have been ineffective in failing to hire him for Wise Height's penalty phase, which is the underlying Strickland claim. And Wise Height wants to use Dr. Gore somehow, in some way, in some method, in some state court, to excuse that default. But to return to the Rhines questions, Your Honor, the other reason it wasn't an abuse of discretion to deny Mr. Wise Height a stay under Rhines was because of the lack of good cause and the dilatory litigation tactics. Wise Height could have asked the Indiana Supreme Court for permission to file a successive petition from the day after that court denied his petition for rehearing on its post-conviction appeal. A stay of habeas proceeding was not required for him to file that document. And had he asked permission and it had been granted, candidly, Respondent would have agreed to a stay if the court had actually granted permission, which it won't, and which it will not even if Wise Height someday asks for it. Is there anything that would preclude him from filing that during the pendency of the federal litigation? Nope, none, Your Honor. The post-conviction rule run 12-12 is pretty open. Indiana does not even have a statute of limitations for initial post-conviction review, let alone for successive post-conviction review. Instead of filing that document, Wise Height chose the strategy that would cause the maximum amount of delay. Instead of actually asking permission for a successive petition in state court concurrent with federal litigation, he wanted delay in this case for the time it would take him to prepare his request to file that petition in state court, and then the subsequent delay that would be caused while the state court considered his request. Rather than expediency, Wise Height's strategy was undue delay, as rightly noted by the district court, and would constitute an independent ground upon which the district court's denial of the Rind State could be affirmed. To discuss the merits of the claims properly before this court, the state court did not unreasonably apply Skipper v. South Carolina when affirming the limitation of James Aiken's testimony because he was unqualified under state law to testify about a prediction of Wise Height's future dangerousness while in custody. The Skipper court explicitly wrote the defense counsel was not offering opinion testimony in that case regarding future events. Rather, the issue in that case was whether some jailers could be excluded to tell the jury that Mr. Skipper had adjusted well while in custody. And the court said it was error to exclude that. The Indiana Supreme Court saw that James Aiken was attempting to predict future events, and they recognized that that was just a different material salient fact than the issue that came up in Skipper. And distinguishing another case based on a salient fact is not an unreasonable application under Section 2254D. Further, the state court relied on state law in finding that James Aiken was unqualified to come to that opinion, which was supported by the record, particularly because James Aiken had almost no knowledge of Indiana's prison system. He hadn't been a warden since 1994, had only been in one Indiana facility in the five years before his testimony, and we don't even know what level of security that particular facility that he visited or toured had. I guess I'm trying to make sure that I appreciate the argument regarding Skipper. The Indiana Supreme Court draws this line between evidence that a person has adapted well to prison but the Supreme Court appears to have rejected that particular argument in Skipper, commenting, you know, that the distinction is elusive. I don't think Skipper can be read. I think Skipper's recognition of that is kind of a basic human recognition, Your Honor, is that the best evidence of future behavior is past and present behavior. But what Skipper was not saying was that unqualified witnesses are allowed to testify about predictions of future behavior because that wasn't the question before the court. So while in practice, in reality, the truth is past behavior is the best indicator of future behavior, here, that evidence of past behavior was not excluded. So there was one jailer from the Clark County Jail who testified at Weisheidt's penalty phase that he did pretty well while he was there except for one incident, and Dr. Price, the neuropsychologist who testified, said that, if I could step back a little bit, he diagnosed Mr. Weisheidt with bipolar and then a cognitive disorder based on a history of traumatic brain injury. He said that the vacillations between manic and depressive phases that bipolar causes are managed well by structure. And he said specifically that incarceration was a type of structure that would help to manage what he termed the poor judgment that would be a result of Weisheidt's mental illness with which he had diagnosed Mr. Weisheidt. So that evidence of past and present adjustment and even future adjustment was presented in this case. Was the petitioner even seeking Mr. Aiken's testimony for the purposes of past conduct? I thought the testimony was solely being admitted for future conduct. In fact, he hadn't looked at all his past records. Yeah, he hadn't even reviewed all of his past records. He'd only met with him for 30 to 45 minutes the night before. Defense counsel told the trial court that Aiken was going to, quote, predict Weisheidt's ability to safely be placed in a less restrictive environment on death row. It is unclear whether Weisheidt's past and present adjustment is part of that. Because if you look at James Aiken's testimony, another reason he was unqualified is he had no standardized tests or ability. I just want to make sure that I understand. So the argument is not that it's categorically excluded future. The argument that I'm hearing this afternoon is that Mr. Aiken was unqualified to give the nature of that testimony. That is their position, Your Honor, and that is the position of the state court under Rex Peel, who said that he was unqualified under state law to render that opinion. But to return to that point, Your Honors, if you look at both Mr. Aiken's post-conviction testimony and his direct appeal testimony, he had a nearly limitless number of factors that he said that he would use. He didn't say which one of those were more important. He didn't say what weight he would put those to come to some type of standardized or scientific evaluation. Our state laws don't let people like James Aiken testify when challenged. But, I mean, I guess moving away from the scientific, because I believe post-conviction proceeding, it bared out that this would have been admissible under 702A of the Indiana Rules of Evidence. He was tendered as both a skilled witness and as an expert witness. And so under 702A, I guess that's what I'm wanting to kind of tease out. Well, to the extent that the difference between 702A and 702B may have mattered in state court, it respectfully doesn't matter in this court, Your Honor, because that's a holding of state law that is unquestionable in federal habeas proceedings. So to the extent that state court proceedings, you know, any discrepancy in the application of Indiana state laws is not before this court. So the only issue there is the unreasonable application of Skipper. That's correct, Your Honor. That's what we were trying to get you to. Yes, Your Honor. I'm sorry, I take that comment as you wanted more on Skipper, or that's what you're trying to elicit from me. I'm sorry, Your Honor. You're fine. I want to discuss, I'd like to discuss Strickland and the ineffective assistance of trial counsel. The Indiana Supreme Court reasonably applied Strickland in finding that Weisheit's trial counsel performed effectively. It recognized that Strickland allows counsel to make some mistakes, but recognized that none of those mistakes rose to deficient performance. If we look at the claim about the Indiana boys' school records. Can we start at the fire, the trial witnesses? The trial witnesses. So, again, that's a mostly state law-based claim, Your Honor. The fire marshal and the assistant fire chief were both found to be qualified to give the opinions that they did, and they complied with state law by not specifically tying their opinion that the fire was intentionally set to Weisheit having said it. As for Detective Blessinger, it was a little, not the term I want to use, but the only one I have right now, Your Honor, is wishy-washy about whether that would have been admissible had that been an opinion the state attempted to, the opinion tying Weisheit to the intentionally set fire, but in the posture in which that testimony raised was on cross-examination. After, on direct examination, Weisheit trial counsel had tried to impeach the thoroughness of the investigation, and the Indiana Supreme Court said, essentially, that it was unclear whether that testimony was admissible because of that little tweak in the posture of it, but certainly it was cumulative of all of the other evidence proving that Weisheit murdered Caleb and Alyssa. That testimony is troubling, just that he was allowed to opine that this fire was intentionally set by the petitioner. I guess in isolation, Your Honor, I think I understand that sentiment. I just think it didn't matter in the context of this case. Because of the prejudice prong on Strickland? Because of the prejudice prong on Strickland. I think deficient performance, we could probably go back and forth, and again, it's going to be whether that's based on a state law claim and how clear that would have been prejudice by any means admissible. But isn't Detective Lessinger's testimony the only direct link between the fire and... The only direct link between... I would say all of Mr. Weisheit's conduct was a direct link to him being the one who murdered these two children. He told one of his co-workers two weeks before this fire that if he thought that the child's mother had cheated on him, he would kill himself and burn everything down. I think that two railroad flares that he admitted he had brought into the house found under an eight-year-old... Sorry, five-year-old boy that he admitted to duct-taping and gagging with duct tape is direct link that he committed these crimes. I don't think a detective's testimony summarizing the results of her investigation was powerful at all in the context of that evidence. To address the Indiana Boys' School records, counsel did not perform deficiently in failing to seek records that they had every reason to believe had been destroyed. Counsel was unequivocally told by the department that would have them that they were destroyed, and there's no indication that they existed anywhere else. Mike Dennis, who was the mitigation investigator, said that in his 20-something, 25, I think, years of doing this work, he had never successfully found anything at the state archives like Weisheit's collateral review counsel was able to do, showing, again, that they worked hard and they were not ineffective sufficient to justify excusing defaults. And weren't they seeking those records to determine his mental health status back then? Yes, Your Honor. Didn't that testimony come in through other witnesses? Yes, Your Honor. And is there any... I don't think I've seen any argument of what would have come in through those records that didn't come in through his own expert or somebody else. I haven't heard that otherwise, Your Honor, because counsel was not deterred by the letter saying that these records had been destroyed. They continued to do a mental health mitigation specifically centered on his childhood. They admitted records from two different mental health facilities around the time he was in the Indiana Boys' School, and they found the counselor for Weisheit's... over Weisheit while he was at the Indiana Boys' School who testified at trial. And really, to the prejudice of it, Your Honor, without the Boys' School records, counsel got all of the good mitigation and none of the bad. None of the bad evidence that those records would have shown. Without the records themselves, the sentencing jury was told that Weisheit had a troubled childhood, that he went to the Indiana Boys' School, that he attempted suicide, and that he was hospitalized for a suicide attempt while he was there, which is powerful mitigation evidence. If the records had actually been uncovered, the state would have known that they contained some negative information, including his admission to using suicide as a manipulation attempt, his proclivity for setting fires, and his, in this quote, stated infatuation with movies and books about psycho killers and people that go crazy. Jeff thinks it would be fun to go crazy and be involved in these sorts of crimes. Without the Indiana Boys' School records, the jury would not have been read that quote about the person that they were considering their sentence for. I do want to discuss Strickland prejudice because it is the reason, the primary reason, the state court affirmed the denial of post-conviction relief. Weisheit's Strickland claims must fail because he could not prove prejudice. One, because of the strength of the mitigation case that counsel did make. Counsel presented a thorough mitigation case and the extra bit of mitigating evidence provided through the experts that he proposes should have testified would not have significantly strengthened that case. The focus of the mitigation case was Weisheit's mental health with a history of traumatic brain injury. His counsel spent significant resources on this issue. They hired a radiologist, a neuroradiologist, and a neuropsychologist. The neuropsychologist, Dr. Price, not only diagnosed Weisheit with bipolar disorder and a cognitive disorder, as did another testifying psychologist. He also spoke to brain injury that had been observed by the defense experts and he also testified that the damage he observed could not be completely attributed to the concussion that Weisheit suffered when he was tased upon his arrest. That's precisely the conclusion that Dr. Gore is supposed to be able to provide, was already provided to the sentencing jury. The other reason, Your Honor, why the state court reasonably did not find prejudice. Because no matter the strength of the mitigating case, they were fighting the facts of a gruesome double child murder. Weisheit admitted that he had hogtied 5-year-old Caleb Lynch because the child was up too late and kept saying I'm sorry too many times for Weisheit's liking. Weisheit also shoved a 12-inch by 12-inch rag down Caleb's throat and secured it there with duct tape over the boy's mouth. And if that weren't enough, he put a railroad flare in Caleb's underwear and set it aflame. He then burned his house down while 8-year-old Alyssa Lynch was inside. Responding firefighters found a house fully engulfed and one testified that it was the largest fire he had ever seen. All of this because Weisheit was jealous that his girlfriend, the children's mother, might have cheated on him and was pregnant with another man's baby. A suspicion that turned out to be wrong. That counsel could only find a bipolar diagnosis and evidence of some minor brain trauma to fight those horrendous facts was not counsel's fault. It was Weisheit's. His counsel was not ineffective, and the state court reasonably held as much. If the court has no further questions of me, we ask that you affirm the denial of habeas relief. Thank you, Mr. Banks. Anything further, Mr. Perkovich? Yes, Your Honor. I want to apologize. My understanding was that the six minutes in revote that I requested were going to be allocated. I was not cognizant, so I had it the full time. So without further ado, one point I wanted to return to with regard to 3599F. This is something that I urge the court to keep in mind. In the event that this case ends and we are in a clemency posture, the first order of business will be to have the imaging done that was not done while this case was an open case. That is why the stay while the case is pending is so vitally important, independent of the effort to return to state court. In other words, the ability to then come back to federal court that Reince recognizes after AEDPA is what is paramount here in protecting Mr. Weissheit's access to this forum. A couple remarks about Claim 27. So the Indiana state law prevailed with regard to Mr. Aiken. That's not the question federally, of course. It's Skipper, Jurek, Lockett, the application of that very clearly established federal law that needs to govern the question as to his testimony. And this is an extraordinary record for Mr. Aiken in that he's been admitted in at least a dozen state jurisdictions, federal district courts around the country. We're unaware of much in the way of any limitation to his testimony with regard to the future danger question. With respect to the D2 and D1 and D2 issues in Claim 12 and Claim 9 respectively, the juror cookies, the factual findings there are not tenable. They are not consistent with the note and the cookies that clearly indicate the expectation that the jury will come back with a verdict against the accused. They're not an endorsement of public service, the cookies. Secondly, with regard to Claim 9, Morgan is on all fours with this record. The state direct appeal decision is patently wrong in its conclusion about its own record. In other words, brief, pages 50, 51, the appellate's brief, point out the four jurors in particular who were automatic death jurors. Yet the direct appeal decision completely sidestepped that and that is in breach of D1. Thank you, Mr. Perkovich. Mr. Perkovich, the court appreciates your willingness and that of your firm to accept the appointment in this case and your assistance to the court as well as your client. The case is taken under advisement and the court will be in recess.